Madourie v Montefiore Med. Ctr. (2026 NY Slip Op 00617)

Madourie v Montefiore Med. Ctr.

2026 NY Slip Op 00617

Decided on February 10, 2026

Appellate Division, First Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: February 10, 2026

Before: Manzanet-Daniels, J.P., Webber, Friedman, González, Michael, JJ. 

Index No. 806549/21|Appeal No. 5647|Case No. 2024-04590|

[*1]Donna Marie Madourie, Plaintiff-Appellant,
vMontefiore Medical Center, Defendant-Respondent.

Horn Appellate Group, Brooklyn (Scott T. Horn of counsel), for appellant.
Mauro Lilling Naparty LLP, Woodbury (Katherine Herr Solomon of counsel), for respondent.

Order, Supreme Court, Bronx County (Michael A. Frishman, J.), entered on or about July 3, 2024, which granted defendant Montefiore Medical Center's motion to dismiss the complaint or, in the alternative, for summary judgment pursuant to CPLR 3212, unanimously affirmed, without costs.
In this medical malpractice action, plaintiff alleges that she developed a pressure ulcer while hospitalized from March 30, 2020 through June 1, 2020. Plaintiff, then age 60, first presented with a cough, fever, and shortness of breath, as well as preexisting comorbidities including morbid obesity, diabetes, hypertension, and removal of a kidney. Due to hypoxemic respiratory failure, plaintiff was placed on a ventilator before testing positive for COVID-19 on April 2, 2020. The need for sedation, coupled with her critical illness, rendered plaintiff unresponsive and unable to ambulate. In particular, plaintiff's sedation and ventilator-dependent state made it difficult to reposition her, as repositioning could cause her to lose synchronicity with the ventilator, potentially impairing rather than assisting respiration.
As a consequence of these factors, the skin at the base of plaintiff's spine began to break down. Plaintiff alleges that the ulcer resulted from defendant's failure to turn her every one or two hours, as required by the standard of care.
This action was properly dismissed under the immunity provision of New York's Emergency Disaster Treatment Protection Act (the EDTPA). While plaintiff challenges the applicability of this provision, we find that the evidence submitted on the motion was sufficient to establish that "the treatment of the individual [was] impacted by the health care facility's . . . decisions or activities in response to or as a result of the COVID-19 outbreak" (Public Health Law § 3082[1][a]-[c]).
In support of its motion defendant submitted, among other things, (1) plaintiff's medical records, (2) an affirmation of a reviewing pulmonary and critical physician expert witness, Elizabeth Awerbuch, D.O., and (3) an affidavit and deposition testimony from defendant's Assistant Vice President of Nursing during plaintiff's admission, Joan O'Brien, R.N.
While Dr. Awerbuch was not employed by defendant, she affirmed that she worked at Elmhurst Hospital and treated thousands of COVID-19 patients there during the early months of the pandemic. Dr. Awerbuch opined that here, despite defendant's best efforts, the need for retraining, coupled with staffing shortages throughout the hospital, elevated the nurse-to-patient ratio as high as 1:10 during plaintiff's stay in the makeshift ICU unit. Dr. Awerbuch found that defendant lacked the resources to meet the same skin care standards it had employed prior to the pandemic, and that defendant was forced to shift its focus to saving as many lives as possible. While the documentation relating to plaintiff's skin care was relatively sparse, this was due to Governor Cuomo's Executive Order 202.10, which suspended ordinary documentation requirements, and the fact that detailed documentation was often not possible given the unprecedented patient demand at that time. Plaintiff's condition as a ventilator-dependent COVID-19 patient also rendered her immobile and more difficult to move safely. Dr. Awerbuch concluded that defendant's care team was able to save plaintiff's life, perform a critical surgery, and treat the decubitus ulcer that formed such that it ultimately healed, which was in accordance with the then-existing standard of care.
Defendant's other witness, Nurse O'Brien, who was directly involved with defendant's response to COVID-19, similarly stated in her affidavit and based on her personal knowledge that the outbreak created staffing issues, a high patient-to-nurse ratio, a reduced prioritization of skin care, and a relaxed documentation requirement. She explained that these factors resulted in less staff time with each patient, and often required staff to prioritize life saving measures, such as ventilator care, over less urgent nursing functions such as skin care. This Court has granted motions to dismiss based on EDTPA immunity in the context of claims stemming from a plaintiff's death from COVID-19 (see e.g. Silva-Rios v New York Pres Colum, -AD3d -, 2026 NY Slip OP 00481 [1st Dept 2026]; Hasan v Terrace Acquisitions II, LLC, 224 AD3d 475, 476, 478 [1st Dept 2024]). In a case where the plaintiff has died from COVID-19, it is usually self-evident that plaintiff's treatment was "impacted by [defendant's] decisions or activities in response to or as a result of the COVID-19 outbreak" (Holder v Jacob, 231 AD3d 78 [1st Dept 2024], quotingformer Public Health Law § 3082 [1] [b]), such that dismissal based on the pleadings and the motion's supporting documentation is appropriate.
Similarly, in a case such as this where plaintiff did not succumb to her illness but rather sustained injuries and complications from her hospitalization for COVID-19 —particularly where plaintiff was intubated and sedated as a result of COVID-19, making it difficult to move her safely — we need not concern ourselves that plaintiff will be placed in the position of "having to accept [defendant's] word on potentially dispositive issues" (Jackson v Bronx Care Health System, 236 AD3d 594, 596 [1st Dept 2025]). Evidence submitted on a dismissal motion reflecting pandemic-related overcapacity, staffing, supply shortages, and changes to the relevant care guidelines because of the pandemic will ordinarily suffice.
This case is distinguishable from this Court's decisions in Jackson (236 AD3d at 596)and Holder (231 AD3d at 88-89), as those cases did not involve intubated patients whose injuries were directly tied to COVID-19. Jackson involved a multiple sclerosis patient who had tested positive for COVID-19 three weeks earlier and fell while trying to walk to the bathroom after purportedly not being timely provided with an assistive device for walking. The Court could not conclusively find on the dismissal motion that the pandemic specifically impacted the defendant's ability to provide plaintiff with a walking device. Similarly, in Holder, the question presented was whether the pandemic impacted the hospital's ability to prevent a fall and diagnose a stroke in an ulcerative colitis patient. That Court found that it would be premature to make that finding on the dismissal motion.
We are presented with a different case here, where the plaintiff's injuries were a direct result of COVID-19. Her condition rendered her immobile and more difficult to move safely, which had a direct impact on the standard of care. Based on these facts, the evidence submitted was sufficient to show that the care provided to plaintiff was performed in good faith, that plaintiff's sacral ulcer was not the product of gross negligence, and that defendant did not depart from the then-existing standards of practice.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: February 10, 2026